Mr. Kevil, welcome back. Please proceed. Thank you, Your Honor. In this IPR, the panel made a broad and unreasonable construction. It construed gasoline so that the claims encompass a different invention than the invention that is described and was prosecuted by the inventors in all of these patents. Starting with the 302 patent, it always talks about the invention being downstream at a tank farm or at a location downstream. And it talks about, such as Appendix 143, the benefits of the invention by blending downstream at the tank farm. And then when you move to the later 948 patents, it talks about in the background butane often being blended with other components at the refinery. And while it does mention gasoline at the refinery, it talks about for the first time, and I'm at Appendix 110, petroleum vendors and distributors are able to take optimum advantage of the many cost-saving and performance enhancements that butane blending offers and to do so without regard to where the blending occurs along the pipeline. And that 111 appendix, it says the same thing. It may be practiced at any point on a pipeline downstream of a refinery. This whole invention was predicated upon the EPA regulations that came out in 1989 that now said you can, at different locations, meet different RVP levels so you have the ability to add butane. And what the inventors came up with was an automated way downstream of the refinery to add butane to the gasoline to the maximum extent allowable, regardless of whether it's in the pipeline or it's at the tank farm. In any event, it's the same invention where what we're dealing with is gasoline, not the pre-gasoline components that are at the refinery. And that's where... Mr. Kevil, this is Judge Crost. Doesn't, as the specification described, the prior art is disclosing, quote, a system for automatically adjusting the amount of butane added to a refinery. And isn't that using gasoline to refer to gasoline at a refinery? Gasoline at a... Well, gasoline streams referred to there at the refinery are the component streams. And that's what you see if you look at the prior art. And that makes sense in the context of what they're talking about. So you have the refinery where you take these different components and you blend them together, along with butane being one of the components. And the output of the refinery is gasoline. And then that's what... But, Mr. Kevil, it says this for more than one reference, right? It talks about another reference by saying it's, quote, a system for blending butane and gasoline at a petroleum refinery. That's at 948 column 2, lines 40 to 42. Yes. It says that, yeah, that's correct. It just says it's a system for blending butane and gasoline at a refinery. And what it talks about is that it blends, in the very next sentence, a low-octane gasoline stream with a high-octane gasoline stream. So we're talking different components that go into the output of the refinery. The expert for the other side even admitted that all of the players in this industry understand that you're acting under EPA regulations, and so you would follow those. And one of the ways that the board erred in this was to say, yes, it's EPA-defined gasoline, and then ignored the fact that that same regulation says the things that are at the refinery are blendstock or gasoline components. They fall outside the gasoline definition. And then search through that one statement in the background, talking about BAEJEC, which, by the way, is owned by one of the licensees of Sunoco, and obviously that licensee didn't think BAEJEC was applicable or didn't apply BAEJEC downstream of the refinery. It instead agreed into a license with Sunoco. But the search to find some reference where I could say, okay, here's a point where gasoline is used in a way that I think can put it into refinery conflicts with the entire invention. And it's not reasonable to say if the whole purpose of the invention is to blend in pipelines or blend at tank farms downstream where you have finished gasoline that is used as fuel, I can search to find one place or two places in the background where gasoline is mentioned at a refinery and then broaden the definition so that I incorporate the very refinery art that the background says is distinct and is not what the invention is. So on the gasoline, the proper construction is refined petroleum that's used as fuel, and then there's an express addition to that in the 302 where it says, as used herein, gasoline also includes diesel and jet fuel. So in any event, it's always the fuel, it's always the finished product, and that makes sense in the context of the invention, that's all this invention was. And so where the board erred in the first point is to go and to try and find a way to broaden that to encompass the very thing that the inventors were saying, here's the background and here's why we're different in what we're doing. The second place, unless the court has any questions, where the board erred is in gasoline and pre-blended gasoline. If you look at the 948 patent, it specifically says in the claims, specifically claim one, that it's a system for blending butane with gasoline in a pipe, wherein the gasoline has a vapor pressure, and then says down in claim three, the system of claim one wherein said processor receives the vapor pressure of a blend of gasoline and butane. So the claim language is very clear that in the first, you're talking about the gasoline, that would be the pre-blend, because otherwise, claim three makes no sense where it says a blend of gasoline and butane. And so... Judge Reynolds? No, go ahead. I was going to say that your friend on the other side argues that your attempt to limit gasoline to pre-blended gasoline is incorrect because the intrinsic record, according to them, repeatedly refers to gasoline both pre- and post-blended streams. In every place, and I think we pointed this out in our brief, in every place where gasoline is used in either the specification or like here in the claims, in particular, when it says degasoline, it's referring back to before the blending. And often, or it's referring back to the blend, but it specifically refers to the blend. And that's what happens in these claims that were challenged where you say you have a vapor pressure of the gasoline, and then you say where you take the vapor pressure of a blend of gasoline and butane. But Mr. Kevill, this is Judge Prost. Isn't it still gasoline if you blend butane into it? Isn't that the ordinary meaning? Kind of like if you put cream in a cup of coffee, it's still a cup of coffee. And why is this a similar situation? Is it your claim construction, which you relied on for the first gasoline argument, an admission that gasoline ordinarily includes the blends we use as fuel? Right. And that's why in these claims, what the inventors, what the patentee did in your analogy would say, I have a cup of coffee, and then I add cream to the coffee, and in one, I take the temperature of the coffee, and in the other, I take the temperature of the blend of cream and coffee. It's still the coffee in both cases. I don't dispute that. But in this claim language, the patentee made clear what is being measured, right? The third point on the vapor pressure is the vapor pressure was, by all testimony, by all the experts, everyone understands the vapor pressure and the vapor-liquid ratio are different measurements. And based on that, everyone understood that these patents and these claims give you two different ways to measure the vapor pressure. There is an ambiguity created by a mistake in the wording where the patentee should have said volatility means in terms of these patents and instead said vapor pressure means. And that simple misunderstanding of one word or a mistake in one word is what caused all this, but it's very clear that the patentee means throughout, and if you look at the claims, it's very clear that the claims say... Mr. Kevel, this is Judge Prost. Just on that point, it may be that the 302 specification uses the term vapor pressure to refer to more general category volatility, which can be measured by a vapor-liquid ratio, but the specification tells us what it's doing. And that's the point of lexicography, defining something to mean something different than its ordinary meaning. So how do you get around that in terms of complying with the public notice function? The language is clear lexicography, I agree, but it's lexicography where everyone that has read this has understood what was intended. What was intended was to say you can look at volatility in different ways. You can look at it as the vapor pressure or you can look at it as the vapor-liquid ratio. Let me just ask you, you made a statement like everyone who has read this, how do we know that? And that's a pretty high hurdle. I wouldn't expect for you to have to prove that, but how would you support that? Everyone who has read this reads it this way? You have 14 licensees that are sophisticated companies and no one has ever raised this issue that says the prior art reads on this because you've interpreted, you know, you've defined vapor pressure to mean something other than vapor pressure to also include vapor-liquid ratio. I think the point is a person of skill in the art is deemed to read in terms of the patent as a whole and then the patent as a whole, it's clear what you're talking about. There's also, we cite in our page 53 of our principal brief, the testimony of two experts who made clear their understanding of this issue was that it was talking about two separate measurements. And even the board found that they're different measurements. So, even the opposing counsel agreed they're different measurements. So, read in the context of the entire specification and the invention, it's clear that you're talking about different measurements. If my colleagues have nothing further, I think I heard the bell getting into your rebuttal. Anything from my colleagues further? If not, why don't we hear from Ms. Fiorella and we'll keep your rebuttal time. I'm fine. Okay. Ms. Fiorella. Good morning, Your Honor. May it please the court, Natika Fiorella on behalf of the Appellees Magellan and Powder Springs Logistics. Your Honor, I'd like to just jump right into the main clean construction issue here, which is on the term gasoline. Now, the board correctly found that the 548 and 948 patents use this term broadly without restriction on location. And in doing so, the board properly rejected two different attempts by Sunoco to try and narrow the scope of the claim term. First, it rejected Sunoco's attempt to draw this arbitrary line between gasoline inside a refinery and gasoline outside of a refinery. And it did that by properly recognizing that the patent repeatedly described both as just gasoline. So, in the colloquy Your Honor had with my friend on the other side, we talked a little bit about these prior art references that talk about blending butane with gasoline in a refinery. And I believe what Mr. Kevel said was, well, what they meant, what the patentee meant when they said that was gasoline components. But that supports the board's construction, because what term did the patentee choose to use when describing gasoline components? The patentee used the word gasoline. And that's the same word that's in the claim. So, therefore, it suggests that the claim term gasoline is broad enough to encompass both. Just to preview the second issue, the second way that Sunoco is trying to limit the scope of gasoline is by saying, actually, not even all gasoline downstream of the refinery is gasoline. Instead, Sunoco wants to exclude from the term gasoline, the gasoline that is actually used as fuel, the one that's blended. As the board properly recognized, that is not supported by the intrinsic record either. So, when we look at the claim, we see that there is no limitation in the 9.058 claim to downstream of a refinery. And what Sunoco is trying to do is pack that limitation into the word gasoline. We already talked about why that's not appropriate. And we go through in our brief the many places in the spec that describe gasoline as both. Ms. Fiorella, this is Judge Prost. Going back to the pre-blend gas issue, on the claim construction, the claim language of Claims 1 and 7 seems to use gasoline and blend to refer to different substances. So, why should we conclude that gasoline can also include blend? So, Your Honor, what I'd say is that the claims describe gasoline, and they describe a blend of gasoline. And we agree they have different scopes. But that doesn't mean they have mutually exclusive scopes. Gasoline is broad enough to encompass both blended gasoline and pre-blended gasoline. And simply what the claims are describing in the preamble is to say, here's a method for adding butane into gasoline to form more gasoline that also has butane. Nothing in that language suggests that the gasoline you're blending butane in can't already have butane. And in fact, the specification in the industry all tell us that the gasoline that comes into these systems often already has butane. And the Board looked at these claims and said, okay, well, these aren't telling us enough about how we could possibly limit gasoline to only pre-blended. So, it looks at the specification. And in the pre-blended gasoline, it encompasses both. And we see that in multiple places. I think the example at Appendix 114 is particularly helpful because it describes, and this is Column 12, Line 64, going into Column 13, Line 1. It describes taking vapor pressure measurements of the gasoline both upstream of the blending unit and downstream. And it also talks about blending. So, earlier in that same paragraph, it says you want to actually add butane to the gasoline. Now, there would be no point in taking measurements upstream and downstream of the blending unit if you're not adding any butane because they'd be the same. So, what the Board properly recognized is that the patentee chose to use the word gasoline to describe both pre-blended and post-blended and use that to inform what the team sees. If I could, I'd like to go back to the main gasoline refinery-based argument just for a minute and discuss this idea that the inventions are limited to downstream of the refinery based on the 302 specification. And the point I want to make there is simply that this is a patent. Those patents are continuations in part from the 302 patents. So, they're different. They removed the language, the locational language that Mr. Kevel referred to about downstream of a refinery, add a tank farm, add a rack. It removed all those limitations to try and claim something broader. And that's what the 948 and 548 did. And in doing so, read directly on the refinery art. I believe Mr. Kevel also said that the 948 and 548 patents distinguished refinery blending. Well, if we look at what they actually distinguished, it wasn't that Bijak and Mayer, these refinery blending operations were done in a refinery. What they distinguished is how that blending was done. So, that also does not show that this entire invention was related to downstream of a refinery. Not the claims, not the intrinsic record, not the extrinsic record, none of that shows. I'd just like to touch very, very briefly on vapor pressure. We think that this is a pretty straightforward issue. And it sounds like Mr. Kevel agrees that there is lexicography here. So, that, we believe, ends the inquiry. The patentee chose the words they wanted to use and expressly told the public, when I say vapor pressure, I mean all of these things. And on his point that anyone who reads this wouldn't view it that way, well, we certainly do. And the licensees that Mr. Kevel referred to, you know, there's plenty of reasons why people might enter into a license agreement. But certainly, we have seen no evidence that they looked at this issue, you know, decided to do a deep dive into claim construction, and came out and said, no, I still want a license. So, we disagree with that characterization. I would be happy to rest on my brief at this point, unless there are further questions from the court that I can answer. Thank you. Hearing none, we'll turn back to Mr. Kevel for a rebuttal. Thank you. Thank you, Your Honor. Your Honor, in essence, this is a CIMED case. The invention was always described clearly as downstream of refinery, whether they used the words tank farm or in a pipeline. Refinery blending is what the invention is not. And my friend on the other side just said, that's not how they distinguished BAEJEC. Well, that's exactly what they said in distinguishing BAEJEC. At Appendix 1470, the patentee said, however, the technology disclosed in BAEJEC is limited to blending gasoline streams as part of the refining process. The various gasoline streams the refiner works with are part of the refining process and are not the end product that is distributed to retailers. And then at 1471, it says, in contrast to the raw components at the refinery, the tank farm distributes finished gasoline ready for consumption. So throughout the specifications, the prosecution history, and all of the arguments, it's always been very clear what the invention is not. The invention is not refinery blending. And that's where the board made the clear error in trying to find a snippet from the background where I could say gasoline can be interpreted broadly to include refinery when the invention was always, we are not the refinery. And U.S. Venture also just said, well, there's no evidence that anybody took a deep dive into these patents. That evidence is at 3048 where Chevron, who is the owner of the BAEJEC patent, actually put in a declaration that's cited here saying that they looked at the patents and decided to use Sunoco for their blending based in part on the strength of their patents. So there was a deep dive done. These are sophisticated companies that own this refinery art that have looked at it. There's record evidence that none of these refineries ever adapted any of these systems to be used downstream of a refinery. So it's hard to imagine. One quick point, Mr. Kevil, just to confirm because I don't think I mentioned it today. The board was still appropriately using the BRI standard in this case, right? That is correct. But the key in that is the R part of the BRI standard, and it has to be reasonable. And in view of an invention that is consistently described in ways downstream, it's unreasonable to say, let me find a way to include it upstream in the refinery. And one other point I want to make on the rejections on obviousness, this court couldn't affirm obviousness without a remand on the secondary considerations, because the board misappropriately applied FOX in a way that just said, well, there's more than one patent on this issue without any looking into whether it is essentially the same invention, which it would be, because in every instance, what we're talking about is an invention that's automated butane and gasoline blending downstream of a refinery, whether it's in a pipeline or at a tank farm. So that was one other point I would make. Okay. Hearing nothing more from my colleagues, we thank both sides, and the case is submitted. Thank you, Your Honor. Thank you.